

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
05/22/2014

| | | |
|---|---|---|
| IN RE: | § | |
| JAMES KENT WOOLDRIDGE; dba | § | CASE NO: 13-32725 |
| PLATINUM TOP SECRET, LLC; aka | § | |
| WOOLDRIDGE | § | |
|     Debtor(s) | § | |
| | § | CHAPTER 13 |

## MEMORANDUM OPINION

On September 9, 2013, Keith Ritchson filed an unsecured claim in the amount of $40,500.00 against the Debtor, James Wooldridge. On October 10, 2013, Mr. Wooldridge filed an objection to the claim. (Case No. 13-32725, ECF No. 35). On January 29, 2103, the Court held a hearing on the objection to claim.

For the reasons set forth in this opinion, Mr. Ritchson failed to prove each of his DTPA claims and his breach of contract claim against Mr. Wooldridge. Accordingly, Mr. Ritchson's claim is disallowed.

### Background

The dispute arises from a bartered trade between Mr. Wooldridge and Mr. Ritchson. Mr. Wooldridge listed his boat on Craigslist for sale or trade in late 2012. Mr. Ritchson contacted Mr. Wooldridge and offered to trade his trailer and four-wheeler in exchange for Mr. Wooldridge's boat. Neither Mr. Wooldridge nor Mr. Ritchson was in the business of selling or buying boats. Each had previously owned one boat.

The boat was docked at the Galveston Yacht Club marina on the date of the sale. The marina's slip fees were paid by Mr. Wooldridge through the end of February. The parties inspected the boat the weekend before and the weekend of the sale. Mr. Wooldridge disclosed to Mr. Ritchson that the engine was not running.

On February 9, 2013, the parties agreed that Mr. Ritchson would trade his enclosed trailer and four-wheeler in exchange for Mr. Wooldridge's boat. On that same day, Mr. Ritchson delivered the trailer and four-wheeler to Mr. Wooldridge, the parties signed the title and the bill of sale, and Mr. Wooldridge gave Mr. Ritchson the keys to the boat and all the proper documentation. The Bill of Sale states that "on February 9, 2013, James Kent Wooldridge, traded vessel "Top Secret," official number 611697, IMO # 080311077, Year 1977, to Buyer, Kevin Ritchson for a 20' enclosed trailer and OS Honda 450R four-wheeler." (ECF No. 52-34). At the time of the agreement, the parties had an oral understanding that Mr. Ritchson would come back at a later date to retrieve the boat, once he obtained a trailer that was suitable to transport it. On February 18, 2013, the vessel sank at the Galveston Yacht Club.

The disputed facts mainly relate to the parties' interaction on the boat on February 9, 2013. Mr. Wooldridge, Ms. Ritchson, and Mr. Ritchson, each testified as fact witnesses at the January 29, 2014 hearing. Richard Frenzel testified as an expert witness.

*Ms. Ritchson's Testimony*

Ms. Ritchson testified that Mr. Wooldridge represented that the boat was in "well working condition other than the engine problems." She did not indicate when and where he made this representation. She also stated that she remembered some discussion about the bilge pump and that Mr. Wooldridge indicated that the shore plug needed to be plugged in but could not recall exactly what was said. Ms. Ritchson testified that the parties agreed that the Ritchsons would obtain a trailer and then come back before the end of the month to pick up the boat. In the meantime, the boar would remain at the Galveston Yacht Club.

She stated that Mr. Wooldridge indicated that he would ask his friend to keep an eye on the boat until they returned to retrieve it and that employees of the marina would occasionally

check on the boat.  She also stated that the only thing that prevented them from moving the boat that day was the fact they did not have a trailer to transport it home.  It was her understanding that if they did have a trailer, they would have been free to take the boat home with them that day.

*Mr. Ritchson's Testimony*

Mr. Ritchson agreed that Mr. Wooldridge disclosed that there were engine problems, but that this was not a concern for him because he knew how to fix engines.  He also testified that Mr. Wooldridge represented that aside from the engine, the boat was in good working condition.  Mr. Ritchson failed to specify when and where Mr. Wooldridge made this representation.

He also testified that Mr. Wooldridge did not disclose any problems with the bilge pump and that he was never made aware of a packing gland leak.  He claims that he would not have purchased the boat if he knew about the leak.

Mr. Ritchson testified that he owned a boat for three years but never dealt with packing gland issues. He stated that he did not know exactly how a bilge pump works, but that he had some experience with them.  He admitted that Mr. Wooldridge told him that the electrical power had to be plugged in for the bilge pump to work.  Mr. Ritchson claims that the electrical power was plugged in when they arrived at the boat on the day of the sale.

Mr. Ritchson testified that it was his understanding that Mr. Ritchson would retrieve the boat "by the end of the month." According to Mr. Ritchson, Mr. Wooldridge stated that he had a friend with a boat in a nearby slip and that his friend would periodically check on the boat until Mr. Ritchson retrieved it.  When asked by opposing counsel whether he thought the deal was done by the end of the day on February 9, 2013, Mr. Ritchson responded that he was not sure. He stated that he thought that he could not move the boat from the marina without contacting Mr.

Wooldridge first. Mr. Ritchson indicated that the marina would require assurances from Mr. Wooldridge before allowing him to move the boat. Finally, Mr. Ritchson stated that he did not purchase insurance on the boat between the date of the sale and the date that the boat sank because he was overwhelmed with work and other things.

*Mr. Wooldridge's Testimony*

Mr. Wooldridge denied that he represented to the Ritchsons that "aside from the engine, the boat was in good working condition." Mr. Wooldridge went into detail as to why he specifically remembers disclosing the packing gland leak: When they arrived at the boat on February 9, 2013, Mr. Wooldridge was surprised to discover that the shore power plug was not plugged in. Mr. Wooldridge claims that upon discovering this, he clearly stated to the Ritchsons that the shore power plug had to be plugged in at all times. He claims that he proceeded to plug in the power plug and that the bilge pump started up. He also recalls pulling up the hatches and shining the flashlight directly on the packing gland leak while Mr. Ritchson inspected.

Mr. Wooldridge also stated that he provided notice of the sale to the marina by telling the office manager that the boat was sold. He was told that this provided sufficient notice to the marina. Mr. Wooldridge stated that it was his understanding that the Ritchsons were free to take the boat home with them on February 9, 2013. Mr. Woolridge gave the keys to the boat to the Ritchsons on February 9, 2013.

*Richard Frenzel's Expert Report and Testimony*

Richard Frenzel, a marine surveyor, provided a Valuation Survey and expert testimony regarding the boat's condition as of February 9, 2013, the valuation of the boat, and the cause of it sinking on February 18, 2013. (ECF No. 51). On January 6, 2014, Mr. Frenzel inspected the

boat's exterior hull, underwater machinery, and hardware while the boat was hauled out at the Galveston Marina Yacht Club.

Mr. Frenzel testified that leaking packing glands can cause a boat to sink while in a slip at a marina. Over 90% of such sinkings are caused by leaking packing glands. He also stated that in most instances "the leaking had not been discovered as long as the bilge pump kept the water in the bilge at a low level." (ECF No. 51 at 7).

Mr. Frenzel testified that (i) the vessel was not fit for its intended use for reasons other than just the engine issues; (ii) the boat sank because of an ongoing problem due to a packing gland leak; (iii) the packing gland was worn down, with heavy green corrosion, and long past due for repair; (iv) the bilge pump, which isn't intended to prevent a packing gland leak, disguised the leak in this instance; (v) because the battery was drained at the time the boat sunk, it could not power the bilge pump; (vi) the use of putty around the forward end of the packing gland was an inappropriate attempt to stop the leaking; (vii) if the shore power had remained connected, then the bilge pump could have continued to disguise the leak and the boat could have stayed afloat for longer; and (viii) the boat in its condition on the day of the sale was worth somewhere between $4,000.00 to $5,000.00, but would have been worth up to $8,000.00 if all deficiencies were repaired.

## Analysis

Mr. Ritchson asserts claims against Mr. Wooldridge for breach of contract and violations of the Texas Deceptive Trade Practices Act.

### Breach of Contract

For Mr. Ritchson's breach of contact claim, the issue is whether the risk of loss passed from the seller to the buyer before the boat sank on February 18, 2013. Tex. Bus & Comm.

Code. § 2.509. The Court finds that the risk of loss passed to Mr. Ritchson on February 9, 2013. Accordingly, Mr. Ritchson's breach of contract claim fails.

Mr. Ritchson's breach of contract theory is simple: "Mr. Wooldridge breached the contract by failing to tender the Vessel as described. The Vessel sank before tender of delivery—the risk of loss had not yet passed to Mr. Ritchson when the Vessel sank." (ECF No. 60 at 2).

Tex. Bus. & Comm. Code § 2.509 determines when the risk of loss passes from seller to buyer. "[T]he risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer *on tender of delivery*." Tex. Bus. & Comm. Code Sec 2.509(c). In this case, neither Mr. Wooldridge (the seller) nor Mr. Ritchson (the buyer) were merchants. A "Merchant" is a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill. Tex. Bus. & Comm. Code Sec 2.104(a).

Mr. Wooldridge is a project manager for a construction company. He testified that he has owned two boats during his lifetime, does not deal in boats, and did not hold himself out as having skills or knowledge peculiar to the sale of boats. Accordingly, Mr. Wooldridge is not a merchant.

*Tender of Delivery*

When the seller is not a merchant, the risk of loss passes to the buyer on tender of delivery. Tex. Bus. & Comm. Code § 2.509(c). "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." Tex. Bus. & Comm. Code § 2.503(a).

In the current case, pursuant to Tex. Bus. & Comm. Code § 2.308(2), the place for delivery of the boat was the marina. "Unless otherwise agreed . . . in a contract for sale of identified goods which to the knowledge of the parties at the time of contracting are in some other place, that place is the place for their delivery." Tex. Bus. & Com. Code Ann. § 2.308(2).

Both parties fulfilled their obligations under the contract on February 9, 2013. On that day, Mr. Ritchson delivered the trailer and four-wheeler to Mr. Wooldridge and the parties signed the title and the bill of sale. Mr. Wooldridge placed the boat at Mr. Ritchson's disposition by giving him the keys, providing him with all of the proper documentation, notifying the marina office manager about the sale, and receiving confirmation that this was sufficient notice for the marina.

Mr. Ritchson cites to a few cases to support his claim that the risk of loss had not yet transferred to him. First he cites *Martin v. Melland's Inc.,* where a farm implement dealer agreed to sell Plaintiff a new truck and attached haystack mover. *Martin v. Melland's Inc.*, 283 N.W.2d 76 (N.D. 1979). Plaintiff paid the purchase price with a combination of cash and with a credit for the trade-in of a used truck. Plaintiff executed and delivered title to the used equipment to the dealer, but retained possession of the used unit as the new unit would not be ready for two or three months. The used truck was destroyed by fire while it was still in Plaintiff's possession. The Supreme Court of North Dakota held that Martin, who was determined to be a non-merchant with respect to the trade-in unit, had not yet tendered delivery of the trade-in unit to the dealer and therefore bore the risk of loss pursuant to U.C.C. § 2-509. However, this case is distinguishable from the present case because unlike Mr. Wooldridge, Martin did not put the goods at the buyer's disposition. In *Martin*, the plaintiff was in possession of the trade-in unit,

continued to use it, and their agreement provided that defendant was not entitled to possession of the trade-in unit until the new unit was delivered to Plaintiff.

In this case, Mr. Wooldridge placed the boat at Mr. Ritchson's disposition by giving him the keys, providing him with all of the proper documentation, and by notifying the marina of the sale. Although Mr. Ritchson testified that he didn't think he could move the boat from the marina without contacting Mr. Wooldridge first, he admitted that he had not even attempted to move the boat prior to its sinking. There is no evidence to suggest that he attempted to assert any control over the boat once the sale was completed. Mr. Ritchson's belief that he couldn't move the boat was based on the unfounded allegation that the marina required assurances from Mr. Wooldridge. Mr. Ritchson failed to identify any of the following details: when this interaction with the marina took place, in what context, which employee told him they needed assurances from Mr. Wooldridge, and whether he provided the marina with the documentation evidencing his ownership in the boat. Mr. Wooldridge provided Mr. Ritchson with all the proper documentation on February 9, 2013.

Mr. Ritchson also cites to cases where the seller was found to be a merchant under Tex. Bus. & Com. Code *Sec 2.104(a)*. *See Caudle v. Sherrard Motor Co.* 525 S.W.2d 238 (Tex.App.—Dallas, 1975); *Ellis v. Bell Aerospace Corp.,* 315 F. Supp. 221 (D.Or.1970)). For example, the *Caudle* case involved a merchant seller, so the Court found that the risk of loss remained with the merchant-seller because the trailer was stolen before the purchaser had taken possession of the goods pursuant to Tex. Bus. & Comm. Code § 2.509(c). *Caudle* at 241. These cases are distinguishable because the risk of loss standard is different for merchants. If the seller is a merchant, risk of loss dos not pass to the buyer until "receipt of goods." This is a far more

onerous standard than "tender of delivery" because "receipt of goods" requires that the buyer take "physical possession of them" under Tex. Bus. & Com. Code § 2.103(a)(3).

Mr. Wooldridge cited the most analogous case to the one at hand. *Taylor & Martin, Inc. v. Hiland Dairy, Inc.*, 676 S.W.2d 859, 869 (Mo. Ct. App. 1984). In *Taylor*, the Missouri Court of Appeals addressed the issue of whether the risk of loss passed from seller to buyer when a trailer was stolen from an auction site before defendant buyer could transport it. The case involved the sale of four trailers at an auction. Due to muddy conditions, the trailers were not able to be moved immediately, but transportation options were scheduled for the next day. The defendant stated he was told that he did not have to move the trailers immediately, but knew he could do so. *Id.* at 864. Based on these facts, the Court held that tender of delivery within the meaning of § 2.503(a) occurred. *Taylor & Martin, Inc. v. Hiland Dairy, Inc.*, 676 S.W.2d 859, 871 (Mo. Ct. App. 1984).

Although Mr. Wooldridge agreed to allow the Ritchsons to keep the boat at the marina until they obtained a trailer to transport it home, the evidence shows that as of February 9, 2013, the Ritchsons owned the boat and were free to move or otherwise exercise control over it. Ms. Ritchson testified that the only thing that prevented them from moving the boat on February 9, 2013 was the fact that they did not have a trailer. Although Mr. Ritchson testified that he thought that he could not move the boat from the marina without getting assurances from Mr. Wooldridge first, he was unable to corroborate this.

**No Contrary Agreement**

The provisions of the risk of loss section are "subject to contrary agreement of the parties." Tex. Bus. & Comm. Code § 2.509(d). The Court in *Caudle* discussed in depth whether it was the intention of the parties to transfer risk of loss from the seller to the buyer by "contrary

agreement" pursuant to Tex. Bus. & Comm. Code § 2.509(d). The *Caudle* court held that "[i]f parties intend to shift the burden of the risk of loss from the seller to the buyer before delivery of the goods, then such must be done in clear and unequivocal language." *Caudle v. Sherrard Motor Co.*, 525 S.W.2d 238, 241 (Tex.App.—Dallas, 1975). In *Caudle* the Court held that the following language was insufficient to constitute a "contrary agreement" between the parties to transfer risk of loss to the buyer pursuant to § 2.509(d): "No transfer, renewal, extension or assignment of this agreement or any interest hereunder, and no loss, damage or destruction of said motor vehicle shall release buyer from his obligation hereunder." *Id.* at 240.

In this case, the parties did not have a contrary agreement to have the seller retain the risk of loss of the boat after the sale was complete. The Bill of Sale and the Certificate of Documentation in this case are silent as to risk of loss. The fact that Mr. Wooldridge allowed Mr. Ritchson some time to move the boat does not mean he agreed to assume the risk of loss. Tender of delivery within the meaning of § 2.509(c) occurred on February 9, 2013, when Mr. Ritchson was given the keys and proper documentation to the boat. Accordingly, the risk of loss of the boat was transferred to Mr. Ritchson on that day.

### DTPA claims

To prevail on a DTPA claim, the plaintiff must establish that: "(1) the plaintiff is a consumer; (2) the defendant either engaged in false, misleading or deceptive acts, that is, violated a specific laundry-list provision of section 17.46 of the DTPA, or engaged in an unconscionable action or course of action; and (3) the DTPA laundry-list violation or unconscionable action was a producing cause of the plaintiff's injury." *Robinson v. Match.com, L.L.C.*, 2012 WL 5007777 (N.D. Tex. Oct. 17, 2012). The Court finds that for each DTPA claim, Mr. Ritchson failed to prove that Mr. Wooldridge violated the applicable provision of the Act.

Mr. Ritchson has asserted four DTPA claims against Mr. Wooldridge: three laundry list violations and the claim that Mr. Wooldridge engaged in unconscionable acts that took advantage of Mr. Ritchson's lack of knowledge, ability, experience or capacity to a grossly unfair degree.

**Mr. Ritchson's Laundry List DTPA Claims**

Section 17.50(a)(1) provides that a consumer may maintain an action for violations of section 17.46. Section 17.46(b) is a non-exclusive list ("laundry list") of defined acts that are prohibited as being unlawfully false, misleading, or deceptive.

Mr. Ritchson alleges that Mr. Wooldridge's oral representation that "the boat is in good working condition other than the engine problems" violated subsections (5) and (7) of the laundry list.[1] He also alleges that Mr. Wooldridge's failure to "disclose any issues with the hull, any other damage to the Vessel, or any risk of imminent sinking" violated subsection (24) of the laundry list. (ECF No. 60 at 8-9). Mr. Ritchson failed to prove that Mr. Wooldridge violated any of these three subsections.

Mr. Ritchson's expert witness, Richard Frenzel, testified that the vessel was not fit for its intended use for reasons other than just the engine issues, that the boat sank because of an ongoing problem due to a packing gland leak, and that the boat was worth somewhere between $4,000.00 and $5,000.00 on the day of the sale. The Court fully credits Mr. Frenzel's testimony. However, Mr. Frenzel's findings do not prove Mr. Ritchson's DTPA claims.

Mr. Ritchson does not prevail on the disputed factual issue of whether Mr. Wooldridge orally represented that "the boat is in good working condition other than the engine problems."

---

[1] "Mr. Wooldridge represented that goods had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they did not have, Tex. Bus. & Comm. Code Sec. 17.46 (5); "Mr. Wooldridge represented that goods were of a particular standard, quality, or grade, when they were actually of another, Tex. Bus. & Comm. Code Sec. 17.46 (7)."

Mr. Wooldridge denied that he made such representation. Although Mr. and Ms. Ritchson each testified that Mr. Wooldridge made such representation, neither specified when and where he made it. The problems with the boat were apparent from even a casual visual inspection. Mr. Frenzel showed detailed pictures of corrosion in the boat. He testified that the corrosion occurred before the boat sank. The pictures were graphic and demonstrated substantial disrepair. The Court does not credit the allegations that Mr. Woolridge represented that the boat was in good condition; any such statement would have been readily contradicted when the hatch was opened for Mr. Ritchson's inspection. Accordingly, based on the credibility[2] of the witnesses and the cumulative facts in the case, the Court concludes that Mr. Wooldridge did not make this representation.

Mr. Ritchson also failed to prove that Mr. Wooldridge failed to disclose material information about the boat. Mr. Ritchson alleges that Mr. Wooldridge's failed to "disclose any issues with the hull, any other damage to the Vessel, or any risk of imminent sinking." (ECF No. 60 at 9).

The evidence shows that Mr. Wooldridge was aware of the packing gland leak, but was unaware that the boat was at any risk of imminent sinking if power to the bilge pump was maintained. Mr. Wooldridge testified that he spent the night on the boat on the weekend prior to selling it to the Ritchsons. Mr. Wooldridge's testimony provided a detailed recollection of the interactions between the parties on the day of the sale. Mr. Wooldridge testified that he disclosed to the Ritchsons that there was leakage from the packing glands. He went into detail as to why he specifically remembers disclosing the leak: When they arrived at the boat on February 9, 2013, Mr. Wooldridge was surprised to discover that the shore power plug was not plugged in.

---

[2] The Court does not imply that Mr. or Ms. Ritchson lied to the Court. Rather, with the passage of time and the corroborating apparent condition of the boat, the Court finds Mr. Woolridge's testimony should be credited over the contrary testimony given by the Ritchsons.

Mr. Wooldridge claims that upon discovering this, he clearly stated to the Ritchsons that the shore power plug had to be plugged in at all times. He also testified that he pulled up the hatches, shined the flashlight directly on the drips, and again explained that the shore power plug had to be plugged in at all times so that the bilge pump worked properly.

Ms. Ritchson had a foggy recollection of the interaction on February 9, 2013. She stated that there was some discussion about the bilge pump but could not recall exactly what Mr. Wooldridge said. Mr. Ritchson's testimony, while earnest, demonstrates that he was confused about the parties' agreement. When asked if he thought was the owner of the boat at the end of the day on February 9, 2013, he responded that "there were just a lot of things I wasn't sure of."

His testimony also suggests that he may not have understood or appreciated some the information that was conveyed to him by Mr. Wooldridge. He testified that Mr. Wooldridge did not disclose any problems with the bilge pump and that he was never made aware of a packing gland leak. However, he admitted that Mr. Wooldridge told him that the electrical power had to be plugged in in order for the bilge pump to work. Even if Mr. Wooldridge did not specifically disclose the packing gland leak, Mr. Wooldridge's statement that "the shore line needs to be plugged in at all times so that the bilge pump would be running" should have alerted Mr. Ritchson about a potential leak. Mr. Ritchson testified that because he had previously owned a boat, he was familiar with bilge pumps. Additionally, Mr. Wooldridge supplied Mr. Ritchson with all the documentation that he had on the boat, including a 2009 Marine Survey that noted that there were signs of leakage around the port side shaft log packing gland. (ECF No. 52-33 at 4). Even if Mr. Wooldridge did not affirmatively point out there was a packing gland leak, these circumstances put Mr. Ritchson on inquiry notice of a packing gland issue, and the 2009 survey affirmatively disclosed the leakage issue.

Accordingly, Mr. Ritchson failed to prove his DTPA claims under subsections (5), (7), and (24) of the laundry list. Tex. Bus. & Comm. Code § 17.46 (5), (7), (24).

**Mr. Ritchson's DTPA Claim Based on Unconscionable Conduct**

"A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish . . . any unconscionable action or course of action by any person." Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Mr. Ritchson claims that Mr. Wooldridge "violated the DTPA by engaging in unconscionable acts that, to Mr. Ritchson's detriment took advantage of their lack of knowledge, ability, experience, experience or capacity to a grossly unfair degree." (ECF No. 60 at 9).

Section 17.45 of the Texas Business & Commerce Code states that an "unconscionable action or course of action" is "an act or practice [that], to a person's detriment: (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration." *Latham v. Castillo,* 972 S.W.2d 66, 67 (Tex.1998) (quoting § 17.45(5)). "To be actionable under subsection (A), the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Id.* (quoting *Chastain,* 700 S.W.2d at 584). "A slight disparity between the consideration paid and the value received is not unconscionable." *Id.* at 583. To be unconscionable, the disparity must be "glaring and flagrant." *Id.*

Mr. Wooldridge did not have a grossly unfair degree of knowledge or experience in the sale of boats. He did not deal in boats and did not hold himself out as having skills or knowledge peculiar to the sale of boats. Mr. Wooldridge and Mr. Ritchson appeared to have similar bargaining power and knowledge about boats. Each of them had only owned one boat other than the one in question. Nor is there any evidence of unfairness in the negotiation process leading up

to the agreement. Mr. Wooldridge supplied Mr. Ritchson with all of the documentation that he had on the boat and allowed him to inspect the boat on two separate occasions.

Finally, the evidence does not demonstrate a gross disparity between the value received by Mr. Ritchson and the consideration he paid. In fact, the best evidence suggests that the value of the boat was close to the combined value of the trailer and four-wheeler. On Mr. Wooldridge's Schedule B, he listed the value of the trailer at $4,000.00 and the four-wheeler at $1,000.00 for a combined total value of $5,000.00. (ECF No. 1 at 13). This $5,000.00 value is within the $4,000.00-$5,000.00 range that Mr. Frenzel valued the boat as of the day of the sale. Accordingly, Mr. Ritchson failed to prove his DTPA claim based on unconscionable conduct.

Mr. Ritchson failed to prove each of his DTPA claims and his breach of contract claim against Mr. Wooldridge. Accordingly, Mr. Ritchson's unsecured claim for $40,500.00 is disallowed.

## Conclusion

The Court will enter an Order consistent with this Memorandum Opinion.

SIGNED **May 22, 2014.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE